1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JODI ALLERTON, individually and on
behalf of others similarly situated,           )
                                                )
                Plaintiff,                      )        Case No.  2:09-cv-01325-RLH-GWF
                                                )
vs.                                             )        **ORDER**
                                                )
SPRINT NEXTEL CORPORATION,                      )        **Motion for Circulation - #14**
                                                )
                Defendant.                      )
_____        )

        This matter is before the Court on Plaintiff's Motion for Circulation of Notice of the

Pendency of This Action Pursuant to 29 U.S.C. § 216(b) and for Other Relief (#14), filed on

August 21, 2009; Defendant's Opposition to Plaintiff's Motion for Circulation (#24), filed

September 15, 2009; Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for

Circulation (#25), filed September 29, 2009; Defendant's Supplemental Opposition to Plaintiff's

Motion for Circulation (#29), filed October 2, 2009; and Plaintiff's Response to Defendant's

Supplemental Opposition (#30), filed October 7, 2009.  The Court conducted a hearing in this

matter on October 1, 2009.

        Plaintiff seeks to certify a collective action under the Fair Labor Standards Act based on

the Defendant's alleged failure to pay her and similarly situated employees regular or overtime

wages for the time it took employees to log into Defendant's computer system and open computer

programs prior to beginning of their work shifts.

## PROCEDURAL AND FACTUAL BACKGROUND

        Plaintiff Jodi Allerton filed her complaint in the District Court, Clark County Nevada on

June 12, 2009. *See Notice of Removal of Action, Exhibit "1"* ("*Complaint*").  Defendant removed

1    the action to this court on July 21, 2009.[1]  Plaintiff's First Claim for Relief alleges that Defendant

2    willfully failed to pay overtime and/or minimum wages by having Plaintiff and similarly situated

3    employees perform "off the clock" work that was neither recorded nor paid by the defendant in

4    violation of 29 U.S.C. §216(b).  *Complaint*, ¶ 14.  The Complaint provides no details regarding

5    these allegations.  In support of Plaintiff's motion for circulation of notice, however, Plaintiff has

6    submitted declarations by herself and two former employees of Defendant, John Henderson and

7    David Sullivan, which describe Defendant's alleged violations and the factual basis for Plaintiff's

8    motion to conditionally certify this case as a collective action under the Fair Labor Standards Act

9    (FLSA).

10            **I.    Plaintiff's Factual Allegations.**

11           Plaintiff Jodi Allerton states that she was employed in the credit department of Defendant

12   Sprint's Las Vegas, Nevada call center as a credit analyst from November 2007 through March 10,

13   2009.  *Motion (#14), Exhibit "A", Allerton Declaration.*  Ms. Allerton states that her job involved

14   handling incoming calls seeking initial approval or modification of credit for Sprint customers.

15   She worked a fixed eight hour shift.  She states that she was required to log into the Defendant's

16   computer system at the start of her shift in order to perform her job duties.  The process of logging

17   in typically took ten (10) minutes if the computer system was functioning properly.  She states that

18   her work time was tracked from when she signed into the phone system, but she "could not take

19   incoming calls until she had gotten all of the computer applications running properly."  As a result,

20   she and other call center workers would not sign into the phone system until they had "usually

21   spent 10 minutes each day getting our computer applications running properly."  *Allerton*

22   *Declaration*, ¶¶ 4, 5.

23           Ms. Allerton further states that Defendant forced her and other call center employees to

24   work "off the clock" prior to the start of their shifts.  She states that if employees signed into the

25

26           [1]Both parties have stated that the class period commenced on July 21, 2006 which is three
     years prior to the removal of the action to this Court.  Plaintiff's Complaint was filed in the
27   Nevada District Court on June 12, 2009, however, and it is that date that the Court will use to
     calculate either the two or three year limitations period.
28

phone system immediately when they began working, "we would almost certainly be subject to bad performance evaluations and probably be terminated because we would be unable to immediately handle incoming calls." ¶ 7.  Defendant required call center workers who logged into the incoming call system before having all of their computer applications running to enter a special "arrival" code that would be tracked.  Call center workers would not be able to handle incoming calls while they were in "arrival" mode which resulted in the workers having lower performance statistics.  Ms. Allerton states that call center workers with lower performance statistics were criticized by their managers and were often terminated.  She further states that "Defendant compounded this problem by deducting points from the record of any worker who was not logged into the call system and ready to take calls . . . within 5 minutes of the start of their shift.  If a call center worker got too many points deducted they would be fired." ¶ 7.  She also states it was impossible to fully log into the computer system and have all necessary applications up and running within five minutes as required by the Defendant. ¶ 8.

Ms. Allerton states that when she started working in Defendant's call center, there were about 65 other persons working as payment specialists in the call center.  She estimates that there were approximately 700 to 800 full-time call center workers who used Defendant's computer system to take incoming calls.  Ms. Allerton states that she spoke with workers in the customer care and technical support departments who advised her that they and other workers in their departments also typically spent about 10 minutes of unpaid time each shift loading computer applications that were needed for their work.  She states that these workers were also full-time employees, meaning that the unpaid work time they spent in loading the computer applications was also unpaid overtime.  ¶ 9.

John Henderson states that he was employed in Defendant Sprint's Las Vegas call center as a technical support staff member from September 2007 through February 2008.  His job involved handling incoming calls for customers needing technical support and he used various computer system applications to perform his job. *Exhibit "B", Henderson Declaration*, ¶¶ 2- 4.  His description of the process for logging into the computer system and the manner in which Defendant allegedly forced call center employees to work "off the clock" prior to the beginning of

3

their shifts is substantially the same as Ms. Allerton's.  He also states that if workers in the technical support department signed into the incoming call system before having their computer applications running, they would be subject to bad performance evaluations and termination.  ¶ 7. He also states that Defendant deducted points from the record of any worker who was not logged into the call system and ready to take calls within a few minutes, perhaps 2 or 3 minutes of the start of their shift.  If a call center worker got too many points deducted, they would be fired.  *Id.* Mr. Henderson states that there were approximately 80 other persons working as technical support staff members when he started working in the call center.  He also believes that there were approximately 700 to 800 full-time call center workers.  ¶ 9.  Mr. Henderson also states that he spoke with full-time workers in the customer care and technical support departments who advised him that they and other workers in their departments also typically spent about 10 minutes of unpaid time each shift loading computer applications that were needed for their work.  *Id.*

David Sullivan states that he was employed in Defendant Sprint's Las Vegas call center as a customer care staff member from January 14, 2008 through September 25, 2008.  His job involved handling incoming calls from business customers who needed assistance with their accounts or service.  *Exhibit "C", Sullivan Declaration*, ¶¶ 2-4.  Mr. Sullivan's declaration is  also substantially the same as Ms. Allerton's and Mr. Henderson's declarations in describing the process of logging into the computer system and the manner in which Defendant forced call center employees to work "off the clock" prior to the beginning of their shifts.  In addition, Mr. Sullivan states that "[d]uring my training sessions before I began working at the call center I was told it was suggested I be at my work desk 15 minutes before my shift began so I could complete the computer log in process before my shift started." ¶ 5.  In compliance with this, he usually arrived 10 minutes early to begin the computer log-in process.  He was not paid for those 10 minutes.  Mr. Sullivan estimates that there were 100 persons working as business customer support staff members in the call center and that there were 700 to 800 full-time call center workers.  ¶ 9.  Mr. Sullivan also states that he spoke with full-time workers in the finance and technical support departments who advised him that they and other workers in their departments also typically spent . . .

4

about 10 minutes of unpaid time each shift loading computer applications that were needed for their work.  *Id.*

## II.     Defendant's Factual Allegations.

Defendant's Opposition (#24), and the attached declarations and documents, attempt to rebut the allegations made by Ms. Allerton, Mr. Henderson and Mr. Sullivan.  In addition to declarations by managers and supervisors in each department of the Las Vegas call center, Defendant has submitted declarations from 36 hourly employees to support its position that call center employees are not required or permitted to work "off the clock" and that Defendant properly tracks and pays all time worked by its employees, including overtime. The Court summarizes Defendant's evidence as follows:

### A.     Call Center Departments:

Credit Department:  Defendant states that its Credit Department assists Sprint's sales department in activating and upgrading service for new and existing customers.  The specific job tasks of the various hourly Credit Department employees differ depending on title and seniority. Newer or lower level credit representatives take incoming calls, whereas more experienced representatives take incoming calls and also perform other non-call duties.  Defendant states that it evaluates Credit Department employees' performance on certain factors or "metrics" which carry equal weight, but the requirements for which differ depending on the job duties of the specific employee. These metrics are (1) quality assurance; (2) hold time (percentage of time an employee puts a caller on hold); (3) average calls per hour; (4) availability adherence (percentage of time employee is available to take calls); and (5) schedule adherence (percentage of time employee adheres to scheduled breaks, lunches, and log-in/log-out times).  Defendant states that paid work time at the beginning of a shift – during which the employee is not yet logged into the phone system or is logged in under an "arrival prep" code– is excluded from the performance evaluation metrics.

### B.     Business Wireless Technical Support Department (BWTS):

Defendant states that its technical support hourly employees primarily address inquiries received from business customers on technical issues involving Sprint telephones.  Most BWTS

employees handle incoming calls, but they occasionally place outgoing calls to follow up on previously initiated or disconnected calls.  BWTS also employs hourly-paid "coaches," who do not take any inbound calls but rather walk the floor and assist employees who handle incoming calls with difficult questions and any other issues that may arise.

        **C.**      <u>**Business Customer Service Department (BCS):**</u>

      Defendant states that the function of its Business Customer Service Department has evolved over time.  Prior to February 2008, hourly employees in BCS served primarily inbound call traffic relating to customer service.  In February 2008, BCS began transitioning away from inbound work to more proactive customer initiation, and there are presently only "Outbound Specialists" in BCS.  Their focus is on initiating contact with customers, rather than receiving incoming calls from customers.  Defendant states that the performance evaluation criteria for BCS hourly employees have never been the same as for employees in Credit, and at no time have BCS employees been rated on number of calls per hour.  Although BCS employees were expected to average a particular number of calls per month, the focus of performance was generally on quality of service and call handle time.  Defendant further states that the performance criteria have changed over time as BCS has changed, and the criteria currently vary by employee depending on the types of programs and customers he or she services. The metrics generally include (1) success at issue resolution, (2) first call resolution, and (3) average call handle time.

        **D.**      <u>**Defendant's Timekeeping Procedures:**</u>

      Defendant states that its methods for timekeeping that bear on payroll have changed during the putative class period to the present.

      1.    <u>Self Reporting With Phone Backup:</u>  Defendant formerly used a "Self Reporting With Phone Backup" system for keeping employee time in the three call center departments.  This system was used in the Credit Department from before July 21, 2006 to February 2, 2008.  It was used in the Business Wireless Technical Support Department from before July 21, 2006 to August 2, 2008.  It was used in the Business Customer Service Department from before July 21, 2006 to July 7, 2007.  Under this system, the individual employees or their direct supervisors entered the number of actual hours worked into Sprint's PeopleSoft database. This number was generally

6

consistent with the number of hours in the employees' pre-scheduled shift and could be coded as regular hours, overtime hours, or other applicable designation.  Employees were paid based on the hours entered into PeopleSoft.  Supervisors reviewed the employees' PeopleSoft entries and compared them to the phone logs for corroboration.  Phone logs were also used to substantiate employees' requests for "exceptions" to scheduled shifts.

While this system was in place, employees were instructed to log into the phone system before logging into the computer and before opening any computer applications.  Defendant states that employees were and are able to log into the phone system in a matter of seconds.  To log into the computer system, the employee presses "Ctrl-Alt-Delete" and enters a username and password in the log-in window.  Defendant states that employees have been instructed that they may open the computer applications required for accepting incoming calls, but to wait to open any others unless and until needed for a specific call.

2.     IEX TotalView with Phone System Backup:   Under this timekeeping system, work hours were recorded by an "IEX TotalView" software program ("IEX").  This system was used in the Credit Department from February 2, 2008 to June 6, 2009, in the Business Wireless Technical Support Department from August 2, 2008 to June 6, 2009, and in Business Customer Support from July 7, 2007 to June 6, 2009.  The employees' pre-scheduled shift times were loaded into IEX and employees were presumptively paid for their scheduled shift hours.  Any deviation from an employee's scheduled shift was termed an "exception" and was entered into IEX by management.  When an employee requested an exception for additional work time, the telephone system acted as a back-up log to corroborate the requested exception.  Management would review the phone log, confirm the exception and enter the additional time into IEX and the employee would be paid for the additional time.

Defendant notes that 27 of the employees from whom it has obtained declarations confirm that they were made aware of and were trained on the process for submitting exceptions and that they had no issues or problems with this process. The employees-declarants who worked overtime also stated that their exception requests have always been granted.  Several of the employee declarations state that employees can begin working 8-15 minutes before the start of their shift and

obtain overtime pay for that time by submitting an exception.  The declarations also indicate, however, that employees may not commence work less than eight minutes before the start of their scheduled shift.

3. <u>IEX TotalView with SCOM Backup</u>:  Defendant installed Service Center Operations Manager ("SCOM") software in or about June 2009 to replace the phone system as the back-up time clock to IEX.  IEX continues to be the primary payroll time recording tool based on employee's scheduled shift as entered in the program.  The SCOM software records the time each employee logs into and out of his/her personal computer.  Exception requests are now corroborated by the SCOM reports which show when the employee was logged into or out of his or her computer.  Defendant states that managers may also use the phone logs as an additional method of backup.  According to Defendant, managers research any substantive discrepancies between IEX and SCOM and correct errors in IEX to ensure that employees are paid for all time worked.  With the advent of SCOM, the employees were trained to log into their computers immediately upon the start of their shift and to log into the phone system at the same time or  immediately after logging into the computer.  The employees are instructed to then open any necessary computer applications.  Defendant states that under this system it is almost impossible for any employee to perform work without it being tracked by at least one of the systems.  Defendant notes neither Ms. Allerton, Mr. Henderson or Mr. Sullivan were still employed by Defendant when this system became operational in June 2009.

**E.     <u>Defendant's Policies, Procedures and Practices Respecting Payment for Actual Time Worked, Including Overtime:</u>**

Defendant states that it has strict policies in place that require that employees report all time worked, prohibit "off the clock work," and provide for payment, on either a straight-time or overtime basis, for all time worked.  Defendant cites the "Sprint Employee Guide" which informs all employees that they cannot perform "off the clock" or "donated" work without pay; and Sprint's "Pay Practices" handbook which states that overtime must be paid for all eligible hours worked in excess of 40, regardless of whether the hours are approved by management or as applicable by state law.  The managers of each department have repeatedly instructed their

subordinate supervisors to pay their employees for all hours worked and to regularly audit their working hours to ensure such payment.  Sprint managers and supervisors frequently remind hourly employees that they are entitled to be paid for all time worked; that they should never perform any unauthorized work without being paid for it; that no one is authorized to instruct them to work off the clock; and they are prohibited from working off the clock.

Defendant states that on or around July 5, 2008, all three call center departments implemented the Virtual Electronic Time Report ("ETR") process which emails a summary of hours worked to all hourly employees for every bi-weekly pay period.  When an employee receives an ETR report, he or she must either approve the reported time for payment or request a change to the reported time.  Management reviews all requested changes to ensure that employees are paid for all time worked.  Defendant states that no employee is ever disciplined for requesting a change. Defendant asserts that the existence and efficacy of these policies, procedures and practices are confirmed by the declarations of the 36 hourly employees submitted in support of its opposition.

F.       **Defendant's Attendance and Performance Standards**:

Defendant states that each of the three departments uses an attendance policy based upon a point system called Attendance Adherence Availability ("AAA"), which discourages tardiness and rewards employees for good attendance.  Defendant denies that this policy is applied in a manner that forces employees to work "off the clock."  Defendant states that the employees in each department are granted a five minute grace period after the start of their shifts to log into the phone and computer before they are considered late.  In addition, employees are not required to be immediately ready for calls once they log in.  Upon logging into the phone system, employees can enter a "not ready" or "arrival prep" code while they open computer applications.  While in "not ready" or "arrival prep" mode, the employee's performance statistics are not measured and therefore employees have no incentive to avoid using these codes.  Defendant states that Credit Representatives are given five minutes of "arrival prep" time.  (The employee-declarants generally state that they can open the necessary computer programs within this five minute "arrival prep" time.)  BWTS employees are allocated up to fifteen minutes of "not ready" time and BCS employees have unlimited arrival prep time.  Defendant again asserts that the employee

declarations show that employees understand how the attendance and performance policies work; that they understand the proper use of the "arrival prep" and the "not ready" codes; and that they understand that their performance evaluations are not affected by use of these codes at the start of their shifts.

### III.   Plaintiff's Rebuttal Declarations.

Plaintiff Allerton, Mr. Sullivan and Mr. Henderson have submitted supplemental declarations which essentially state that the declarations of Defendant's management personnel and current hourly employees are untrue.  Ms. Allerton reiterates that she and other credit department workers were required to be logged into the phone system and be ready to take customer calls, with all of their computer programs set up and running, at the beginning of their shifts.  She states that "I was explicitly, and repeatedly, verbally instructed by my superiors that Sprint expected us to meet this standard." *Reply (#25), Exhibit "A", Allerton Supplemental Declaration*, ¶ 4.  She also states that credit employees were required to have about ten computer programs running before logging into the phone system, and that the log-in process took about ten minutes under the best conditions, not the five minutes claimed by Defendant and the employees from whom it has obtained declarations.  Ms. Allerton also states that her supervisors observed the computer log-in process and were aware that it took ten minutes for employees to log into the computer programs. ¶ 5.

Ms. Allerton also disputes Defendant's assertion that credit department employees could place their phones in  "not ready" or "arrival prep" mode for up to five minutes while they opened the necessary computer programs.  She states that if employees stayed in the "not ready" mode for even one or two minutes, they would be told by their supervisors that they had to immediately switch to the ready mode.  She also states that employees would be told that their performance was below standards if they spent any significant amount of work shift time in the "not ready" mode.  ¶ 7.  Employees would also be criticized if their customer "on-hold" time was above Defendant's standards.  For this reason, credit employees would not risk placing customers on hold by logging into the phone system until all of their computer programs were running. ¶ 10.

. . .

1      Ms. Allerton also states that Defendant never informed her or the other credit call center

2   employees of the "metrics" it used to evaluate their job performance or that taking the time to load

3   computer programs after signing into the phone system would not be held against them.  ¶ 9.  Ms.

4   Allerton also disputes Defendant's assertion that employees could log in between 8 and 15 minutes

5   before their scheduled shift and be paid overtime. ¶ 11.  She states that she was told by most of the

6   other credit call center workers that she worked with they were very concerned about losing their

7   jobs because they failed to meet those on-time work reporting standards.  ¶ 12.

8      David Sullivan also states that he and other BCS workers were required to log into the

9   phone system and be ready to take customer calls, with all computer programs up and running, as

10  soon as their shift started.  *Reply (#25), Exhibit "B", Sullivan Supplemental Declaration*, ¶ 4.  He

11  states that he was verbally given this instruction and that "[t]his policy was also set forth in a

12  written communications (sic)."  He also reiterates that the computer log-in process took about ten

13  minutes under favorable conditions and that his supervisors were aware of the time it took to get

14  the computer programs running.  He states that his supervisors told him that he needed to get the

15  programs up and running before the start of his shift.  ¶ 5.  Mr. Sullivan also states that BCS

16  employees were not permitted to stay in the "not ready" mode for more than 1 or 2 minutes.  He

17  states that "[s]upervisors would even punch the keys on a call center worker's keyboard to put

18  them in the 'ready' mode because the worker was still logged in as 'not ready' just one or two

19  minutes after starting the shift." ¶ 7.  Mr. Sullivan also disputes that employees were allowed to

20  log into the phone system for up to five minutes after the scheduled start of their shifts.  Defendant

21  only allowed this grace period to be used two or three times in a month or quarter.  ¶ 8.  Mr.

22  Sullivan echoes Ms. Allerton's statement that employees would be criticized for excessive

23  customer "on hold" time which also made it necessary for employees to have their computer

24  programs running when they started their shifts.  ¶ 11.

25      Mr. Sullivan also states that BCS employees were not allowed to start their shifts 8 to 15

26  minutes early.  He specifically requested such an "exception" to start up his computer, and it was

27  rejected by his supervisor who indicated that such work time was normal and expected and would

28  not be paid as an exception.  ¶ 12.  Mr. Sullivan also states that during the time he was employed

by Defendant in the Business Customer Service department, 95 percent of his time involved handling incoming calls and that at least 90 percent of the BCS call workers were handling inbound calls.  ¶ 17.

Mr. Henderson reiterates many of the same factual assertions made by Ms. Allerton and Mr. Sullivan as also applying to employees in the Business Wireless Technical Support (BWTS) department.  *Reply (#25), Exhibit "C", Henderson Supplemental Declaration.*  Mr. Henderson also states that BWTS employees were instructed to be at their work stations at least 15 minutes before the start of their shifts so that they could have all computer programs loaded and running when the shift began.  ¶ 5.

## DISCUSSION

Under the FLSA, an employee may initiate a class action on behalf of herself and other similarly situated people. 29 U.S.C. § 216(b). The requirements for class action certification under Fed.R.Civ.P. 23(a) do not apply to claims arising under the FLSA.  *Kinney Shoe Corp. v. Vorhes,* 564 F.2d 859, 862 (9th Cir.1977); *Davis v. Westgate Planet Hollywood Las Vegas*,  2009 WL 102735 *8 (D.Nev. 2009).  Although a plaintiff may bring an action on behalf of herself and others similarly situated, "no employee shall be a party to any such action unless he gives his consent in writing to become such a party and such consent is filed with the court in which such action is brought."  29 U.S.C. § 216(b).  District courts have the discretion in appropriate cases to implement § 216(b) by facilitating notice to potential plaintiffs.  *Hoffmann-LaRouche, Inc. v. Sperling,* 493 U.S. 165, 169, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *Edwards v. City of Long Beach,* 467 F.Supp.2d 986, 989 (C.D.Cal. 2006).

I. **Whether Plaintiff Has Made A Sufficient Showing for Conditional Class Certification.**

The court must preliminarily determine whether the potential plaintiffs are "similarly situated" to create an opt-in class under § 216(b).  *Davis v. Westgate Planet Hollywood Las Vegas*, 2009 WL 102735 at *9, citing  *Grayson v. K-Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996).  A named plaintiff seeking to create a § 216(b) opt-in class need only show that his/her position is similar, but not identical to, the positions held by putative class members.  *Sperling v. Hoffman-La*

12

1    *Roche, Inc.,* 118 F.R.D. 392, 407 (D.N.J.1988), aff'd in part and repealed and dismissed in part,

2    862 F.2d 439 (3rd Cir.1988), aff'd, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).  The

3    similarly situated requirement of § 216(b) "is more elastic and less stringent" than the joinder and

4    severance requirements found in Rule 20 and Rule 42 respectively of the Federal Rules of Civil

5    Procedure.

6            The Ninth Circuit has not yet formulated a test to determine whether putative class

7    members are similarly situated.  Several courts, however, have adopted a two-step approach for

8    determining whether potential plaintiffs are similarly situated.  Under this approach, the court first

9    makes an initial determination whether to conditionally certify a class under § 216(b) and send

10   notice to potential class members and give them the opportunity to join the action.  After discovery

11   is completed, the defendant may move, at the second stage, to decertify the representative action

12   and the court then makes a final determination, based on the evidence, whether the FLSA

13   representative action should go forward.  At the first stage, the court relies "primarily on the

14   pleadings and any affidavits submitted by the parties," [to decide] "whether the potential class

15   should be given notice of the action." *Davis, supra,* at *9, citing *Leuthold v. Destination America,*

16   *Inc.,* 224 F.R.D. 462, 466 (N.D.Cal.2004).  A fairly lenient standard is applied at this stage

17   because the court has "minimal evidence" to make its determination. *Mooney v. Aramco Services,*

18   *Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995); *Kane v. Gage,* 138 F.Supp.2d 212, 214

19   (D.Mass.2001).  A plaintiff need only make substantial allegations that the putative class members

20   were subject to a single decision, policy, or plan that violated the law. *Mooney,* 54 F.3d at 1214 n.

21   8.

22           Although a lenient standard is applied at the initial stage, a plaintiff does not meet her

23   burden through unsupported assertions of widespread violations. *Edwards v. City of Long Beach*

24   467 F.Supp.2d 986, 990 (C.D.Cal. 2006). *See also Bernard v. Household Intern., Inc.*, 231

25   F.Supp.2d 433, 435 (E.D.Va. 2002) ("Mere allegations will not suffice; some factual evidence is

26   necessary") and *Smith v. Sovereign Bancorp., Inc.*, 2003 WL 22701017, *2 (E.D.Pa. 2003) (same).

27   Some courts hold that a motion for conditional class certification must be based on admissible

28   evidence. *Harrison v. McDonald Corp.*, 411 F.Supp.2d 862, 865-866 (S.D. Ohio 2005); *Richards*

13

1   *v. Computer Scis. Corp.*, 2004 WL 2211691, *1 (D.Conn. 2004); and *Threatt v. Residential CFR,*

2   *Inc.*, 2005 WL 463199, *5 (N.D. Ind. 2005).  Other courts state, however, that affidavits or other

3   evidence submitted in support of a motion for conditional certification do not have to meet the

4   admissibility standard applicable to summary judgment motions.  *White v. MPW Industrial*

5   *Services, Inc.*, 236 F.R.D. 363, 368 (E.D. Tenn. 2006); *Crawford v. Lexington-Fayette Urban*

6   *County Government*, 2007 WL 293865, *2-*3 (E.D.Ky. 2007); *Bredbenner v. Liberty Travel, Inc.*,

7   2009 WL 2391279,*2 n. 1 (D.N.J. 2009); *Howard v. Securitas Security Services,* 2009 WL

8   140126, *3 (N.D.Ill 2009); and *Longcrier v. HL-A Co., Inc.*, 595 F.Supp.2d 1218, 1224 n. 8

9   (S.D.Ala. 2008).  Affidavits must, however, be based on the affiant's personal knowledge.

10  Otherwise, they would be no more probative than the bare allegations of the complaint and the

11  requirement of factual support would be superfluous.  *White v. MPW Industrial Services, Inc.*, 236

12  F.R.D. at 369.  Personal knowledge may be inferred from what the affiant would have probably

13  learned during the normal course of employment.  *Id.*

14          There is a dispute in this case whether Defendant had (or has) a policy or practice that

15  required its Las Vegas call center employees to work "off the clock" prior to the start of their

16  shifts.  Plaintiff and her two supporting declarants provide some factual basis for their allegations

17  that Defendant Sprint's Las Vegas call center employees were required to work approximately ten

18  minutes before the official start of their shifts to open their computer programs and be ready to

19  start taking calls as soon as their shifts began.  They claim that this policy or  practice actually

20  existed notwithstanding Defendant's written policies and procedures and the contrary declarations

21  of Defendant's call center managers, supervisors and other employees.

22          In opposing conditional class certification in this case, Defendant relies on *Hinojos v. The*

23  *Home Depot, Inc.*, 2006 WL 3712944 (D. Nev. 2006), in which the court denied a motion for

24  conditional certification of a nationwide class of defendant's employees based on allegations that

25  included the allegation that employees were regularly required to work "off the clock" without

26  compensation.  The plaintiffs in *Hinojos* submitted affidavits from five of the six plaintiffs and

27  declarations from five other current and former employees.  The court noted, however, that

28  plaintiffs conceded that they had little knowledge of FLSA violations outside of Las Vegas.

14

1   Defendant submitted documentary evidence regarding its official written policy that prohibited

2   "off the clock" work and declarations from 48 of its Nevada store employees, including 23

3   employees who worked in the same stores in which the plaintiffs worked.  All of these declarants

4   denied that they were required to work "off the clock."  Defendant also submitted a study by a

5   "nationally-recognized public opinion research firm" which found that unpaid "off the clock" work

6   and other improper time reductions were rare occurrences in defendant's Nevada stores.  The

7   defendant had also deposed five of the six plaintiffs and was able to point to inconsistencies

8   between their declarations and their deposition testimony.  Finally, the defendants had produced

9   voluminous time records for all of its Nevada stores (which apparently did not contain any

10  evidence to support plaintiff's allegations).  The court held that there was no evidence of any

11  improper common practice, policy or culture at Home Depot that would justify conditional

12  certification on a nationwide basis.  Although the court was considering plaintiff's motion for

13  issuance of nationwide notice at the first tier of the notice process, it held that there was "a

14  sufficient evidentiary record to determine whether this action can be managed on a collective

15  basis." *Hinojos*, 2006 WL 3712944 at *2.  *Lockhart v. County of Los Angeles*, 2008 WL 2757080

16  *4 (C.D.Cal. 2008) notes that *Hinojos* is among those cases which have skipped the first-step

17  analysis and proceeded directly to the second step because substantial discovery has already been

18  completed, and the court has a sufficient evidentiary record upon which to make a final FLSA

19  class certification decision.  *Lockhart* distinguished *Hinojos* on this ground because the case before

20  it was in its early stages and substantial discovery had not yet been completed.  This Court also

21  finds *Hinojos* distinguishable on the same basis.

22      Defendant also relies on *Brooks v. BellSouth Telecommunications, Inc.*, 2009 U.S. Dist.

23  LEXIS 20552 (N.D.Ga. 2009).   In *Brooks*, two plaintiffs brought suit against their employer,

24  BellSouth, alleging that they were required to perform "off the clock" work in defendant's Conyers

25  Georgia call center, including unpaid work for logging into their computers before logging into the

26  phone system at the start of their shifts.  In support of their motion for conditional class

27  certification, the plaintiffs submitted nearly identical declarations from 26 employees who held

28  various positions in defendant's call centers in Georgia and other states.  Defendant, however, also

15

1   presented evidence that the employees' pay was not dependent upon when they logged into the

2   phone system, but was instead determined by their scheduled shift.  Defendant submitted

3   declarations from 74 call center employees, supervisors, managers and directors who stated that

4   employees were prohibited from logging into the phone system or computer system prior to the

5   start of their shifts and that employees were required to first log into the phone system and then the

6   computer system.  Defendant also presented evidence that employees who worked outside their

7   shifts were required to submit "exception logs" for the time worked and were paid for the

8   additional time.  In reply, plaintiffs submitted 16 additional declarations which acknowledged that

9   defendant used an "exception log" for employees, but that they were deterred from submitting

10  exception logs out of fear of being reprimanded.  The court denied plaintiffs' motion for

11  conditional class certification in large part because plaintiffs' theories of how defendant deprived

12  them of overtime materially changed from the allegations of the complaint to the declarations

13  submitted in support of the motion for conditional certification and then to the declarations and

14  arguments that plaintiff submitted in reply to defendant's opposition.

15         Other district courts, however, have granted conditional class certification based on similar

16  factual allegations.  In *Bishop v. AT&T Corp.*, 256 F.R.D. 503 (W.D. Pa. 2009), the court granted

17  conditional certification in a case involving similar allegations regarding call center employees.

18  The court distinguished *Brooks*, in part, because of the number of declarations that the *Brooks*

19  defendant had submitted in opposition to the motion and because the plaintiffs' allegations were

20  inconsistent and not based on personal knowledge.  *Bishop*, 256 F.R.D. at 507 n. 6.  In *Fisher v.*

21  *Michigan Bell Telephone Co.*, ---F.Supp.2d ---, 2009 WL 3427048 (E.D. Mich., decided October

22  22, 2009), the court further states:

23         [T]he vast majority of United States District Courts have routinely
       granted conditional certification to call center employees alleging
24     similar "off-the-clock" FLSA violations. *See, e.g., Bishop v. AT & T
       Corp.,* 256 F.R.D. 503 (W.D. Penn.2009) (granting the plaintiff's
25     motion to conditionally certify a collective action for the defendant's
       call centers in various states); *Russell v. Illinois Bell Tele. Co.,* 575
26     F.Supp.2d 930 (N.D. Ill.2008) (same); *Burch v. Qwest Commc'ns
       Int'l, Inc.,* 500 F.Supp.2d 1181 (D. Minn.2007) (same for nationwide
27     collective action); *Sherrill v. Sutherland Gobal Servs., Inc.,* 487
       F.Supp.2d 344 (W.D.N.Y.2007) (same for the defendant's call
28     centers in various states); *Clark v. Convergys Customer Mgmt.*

1    *Group, Inc.,* 370 F.Supp.2d 601 (S.D. Texas 2005) (same for
     nationwide collective action).

2

3         *Fisher* reiterated that on a motion for conditional certification, "the Court does not resolve

4    fact disputes, decide substantive issues on the merits or make credibility determinations." *Id.,*

5    2009 WL 3427048 at *6, citing *Brasfield v. Source Broadband Servs., LLC*, 257 F.R.D. 641, 642

6    (W.D. Tenn. 2009).  The court also agreed with *Bishop* that the plaintiffs are not required to show

7    that the challenged policy is in writing.  The fact that the defendant has a procedure for obtaining

8    overtime compensation and has a written code or policy that prohibits "off the clock" work does

9    not preclude conditional certification where the plaintiffs present some evidence of a

10   countervailing unwritten policy or practice that requires employees to work uncompensated

11   overtime before or after their shifts or during unpaid breaks.  *Id.*, at *7.

12        In *Fisher* and most of the cases cited therein, including *Bishop*, numerous employees had

13   already elected to join the lawsuits and the plaintiffs had produced significant numbers of

14   employee declarations to support their allegations of a common policy or practice in violation of

15   the FLSA.  The number of plaintiffs or employees who had already agreed to join the action and

16   had submitted declarations were clearly relevant to the courts' determination that plaintiffs had

17   made the requisite showing for conditional certification.  In *Hens v. ClientLogic Operating Corp.*,

18   2006 WL 2795620 (W.D.N.Y. 2006), for example, the court stated that defendant's argument that

19   plaintiffs allegations involved "isolated deviations" from its lawful policy was belied by the

20   numerous employee declarations submitted in support of plaintiffs' motion.

21        In this case, Ms. Allerton is the single plaintiff and there are only two other declarants and

22   potential opt-in plaintiffs in support of her motion.  The two declarants worked in the technical

23   support and customer service departments, so as to provide a factual basis to include hourly

24   employees in those departments in the proposed FLSA class.  Given the paucity of Plaintiff's and

25   supporting declarations in this case, however, Plaintiff has made a less convincing case for

26   conditional class certification than did the plaintiffs in *Fisher, Bishop* and the other call center

27   cases cited above.  Arguably the closest case to this, in terms of numbers of plaintiffs and

28   declarations, is *Clarke v. Convergys Customer Management Group, Inc.*, 370 F.Supp.2d 601, 606

17

1   (S.D. Tex. 2005).  In *Clarke*, there were three plaintiffs and it appears that only these plaintiffs

2   submitted declarations in support of the motion for conditional certification.  The court held that

3   plaintiffs had made detailed allegations regarding defendant's alleged policy or practice which

4   deprived them of overtime pay for "off the clock" work.  The court held that these allegations were

5   sufficient to support "conditional certification of and notice to workers (1) in a single job category

6   (2) on a single floor (3) at a single facility (i.e. the Houston call center) (4) who were all hourly

7   non-exempt employees."

8          Some courts, primarily (if not entirely) in the Eleventh Circuit, have required plaintiffs to

9   show that other individuals within the putative class desire to opt into the action.  *Dybach v. State*

10  *of Florida Dept. of Corrections*, 942 F.2d 1562 (11th Cir. 1991). This requirement has not been

11  applied by district courts in the Ninth Circuit.  *See Davis v. Westgate Planet Hollywood Las*

12  *Vegas*, 2009 WL 102735, *12 (D.Nev. 2008); *Hoffman v. Securitas Security Services*, 2008 WL

13  5054684, *5 (D.Idaho 2008), and *Mowdy v. Beneto Bulk Transp.*, 2008 WL 901546, *7 (N.D.Cal.

14  2008).  Because there are only three putative plaintiffs at present in this action, the *Hoffman*

15  court's rejection of this requirement is worth quoting:

16          "As a practical matter it would make little sense to require plaintiffs
            to have the knowledge they attempt to obtain by gaining approval of
17          notice from the court."); *Adams,* 242 F.R.D. at 535-36 (discussing
            only similarly situated requirement); *Leuthold,* 224 F.R.D. at 468
18          (same); *Edwards v. City of Long Beach,* 467 F.Supp.2d 986, 990
            (C.D.Cal. 2006) (same).  Independent of this apparent reality, such a
19          threshold requirement strikes this Court as contradictory to the very
            notion of providing *notice* to potential plaintiffs of the opportunity to
20          become part of a collective action-what the FLSA expressly
            provides.  Such a perspective is not unique; indeed, in characterizing
21          as dicta *Dybach's* requirement that other employees definitively
            desire to opt-in to the action, the district court in *Reab v. Electronic*
22          *Arts, Inc.,* 214 F.R.D. 623 (D.Colo. 2002) reasoned:

23                  The cited language in *Dybach* is *dicta.*  Research fails to
                    reveal any court that has applied this requirement.
24                  Moreover, the instruction appears to conflict with United
                    States Supreme Court's position that the [FLSA] should be
25                  liberally "applied to the furthest reaches consistent with
                    congressional direction."
26
27          *Reab,* 214 F.R.D. at 629 (quoting *Alamo Found. v. Secretary of*
            *Labor,* 471 U.S. 290, 302, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985)).
28          *Reab* persuasively goes on to discuss the consequence of mandating

what amounts to a guarantee that potential plaintiffs would actually seek to join the lawsuit, stating:

> [R]equiring plaintiffs in § 216(b) actions to have some unknown number of persons decide whether to opt in places plaintiffs in the position of communicating with potential litigants without court supervision or guidance, leaving plaintiffs subject to allegations of improper solicitation and "tainting" of the putative class.  At this stage of the proceedings, the number of persons who wish to join the action is not a factor I consider in determining whether to grant Plaintiffs' motion to certify.

> *Id.; see also Heckler v. DK Funding,* 502 F.Supp.2d 777, 780 (N.D.Ill.2007) (producing evidence of other opt-in plaintiffs "would essentially force plaintiffs or their attorneys to issue their own form of informal notice or to otherwise go out and solicit other plaintiffs. This would undermine a court's ability to provide potential plaintiffs with a fair and accurate notice and would leave significant opportunity for misleading potential plaintiffs.").

*Hoffman*, 2008 WL 5054684 at *6.

Defendant also argues that the declarations of the 36 Sprint employees attached to their opposition support the denial of the motion for conditional certification.  Courts have relied, in part, on such declarations to deny conditional certification of a collective action.  *See e.g., Hinojos v. The Home Depot, Inc.* and *Brooks v. BellSouth Telecommunications, Inc., supra.  See also Bishop v. AT&T Corp., supra*, (distinguishing *Brooks* based on the lack of such declarations). Plaintiff argues, however, that the Court should disregard the employee declarations submitted by Defendant because they smack of employee coercion.  Courts have stricken such employer-obtained declarations where the circumstances indicate that the employer used improper tactics or influence to obtain the declarations and/or the employees were not fully informed about the consequences of executing such declarations, including that they might thereby be prevented from participating in the action as opt-in plaintiffs.  *See Sjoblom v. Charter Communications, LLC*, 2007 WL 5314916 (W.D. Wis. 2007) and *Longcrier v. HL-A Co., Inc.*, 595 F.Supp.2d 1218, 1225-29 (S.D.Ala. 2008).

Even in the absence of evidence that the declarations were improperly obtained, *Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. 2006), states that the evidentiary value of such affidavits is sharply limited where the plaintiff has not yet had the opportunity to

depose the affiants.  Plaintiff has not yet had the opportunity depose any of the employees or to the explore the circumstances under which Defendant obtained the declarations.  While the Court makes no conclusion regarding the ultimate admissibility of these declarations, it agrees with *Damassia* that they do not have significant evidentiary value at this stage of the case.  Again, the Court is not called upon, at this time, to resolve fact disputes concerning the merits of Plaintiff's claims or to make credibility determinations.  Instead, the Court must simply decide whether Plaintiff has made the requisite factual showing for conditional class certification under the lenient standard applicable at this stage of the case.

The declarations of Ms. Allerton, Mr. Henderson and Mr. Sullivan contain sufficiently detailed factual allegations which, if true, support the conclusion that Defendant's Las Vegas call center non-salaried, hourly employees were required to spend approximately ten minutes of unpaid time prior to the start of their work shifts logging into and opening their computer programs.  The Court is also persuaded by the reasoning in *Hoffman v. Securitas Security Services* that, so long as Plaintiff has made the minimum factual showing required under the lenient standard, it is preferable to authorize a court approved notice to potential class members than it is to deny the motion on the grounds that Plaintiff has not shown that other employees desire to join in this action.  Accordingly, the Court will approve the issuance of a notice to Defendant's former and current non-salaried employees in each of the three departments of Defendant's Las Vegas call center, whose job duties included the taking of incoming calls and which required them to log into the Defendant's phone and computer systems to perform their duties.

Although Defendant asserts that the Business Customer Service (BCS) department has transitioned away from handling inbound calls since February 2008, and that employees now only initiate calls to customers, it is not clear when this transition was complete.  Mr. Sullivan asserts that BCS employees were still handling incoming calls when he left Defendant's employment in September 2008.  Defendant has shown, however, that since June 6, 2009, its "SCOM" software has recorded the time each call center employee logs into and out of his/her personal computer.  This software is used to back up the IEX timekeeping system and employees are now instructed to log into their computers before they log into the phone system and to then open any necessary

1   computer applications.  Exception requests for additional hours are corroborated by the SCOM

2   reports.  Defendant states that under this system it is almost impossible for any employee to

3   perform work without it being tracked by at least one of the systems.  Ms. Allerton, Mr. Henderson

4   or Mr. Sullivan were no longer employed by Defendant when this system became operational in

5   June 2009.   Plaintiff has not produced any other evidence that would dispute Defendant's

6   assertions regarding its timekeeping system since June 6, 2009.  Accordingly, the Court will limit

7   the conditionally certified class and notice to call center hourly employees who worked for

8   Defendant up to and including June 6, 2009.

9           **II.     Form of Notice, Methods of Service, Time Limits for Potential Plaintiffs
                       to Opt-In.**

10

11                  **(a)     Form of Notice.**

12          Defendant has raised several objections to the proposed notice form attached to Plaintiff's

13   motion.  In particular, Defendant requests that the notice be distributed to only hourly (i.e., non-

14   salaried) credit department employees, who like Ms. Allerton, exclusively handled incoming

15   telephone calls.  Plaintiff does not oppose limiting the class and the notice to hourly non-salaried

16   call center employees, but argues that it should include non-salaried call center workers in the

17   Credit, Business Wireless Technical Support (BWTS) and Business Customer Service (BCS)

18   departments whose duties include, in whole or in part, the handling of incoming calls from

19   customers.  Because the Plaintiff's declarations provide a factual basis to include non-salaried

20   hourly employees in all three departments, the Court agrees with Plaintiff's position.  Attached

21   hereto is a revised form of notice which addresses Defendant's other objections or requested

22   changes to the form of the notice including Defendant's request that the case caption and signature

23   of the judge be eliminated in order to avoid the appearance that the Court has made a

24   determination on the merits of the Plaintiff's claims.

25                  **(b)     Methods for Distribution or Delivery of the Notice.**

26          Plaintiff requests that the notice be circulated to the putative class members by (1) first

27   class mail, (2) through the Defendant's email system, (3) that the notice be posted in Defendant's

28   business locations, and (4) that the notice be published in the next three issues of Defendant's

1   newsletter.  Defendant argues that the Court should only order service by first class mail.  This

2   Court previously dealt with an identical request by the same plaintiff's counsel in <u>Pittman v.</u>

3   <u>Westgate Planet Hollywood Las Vegas, LLC</u>, Case No. 2:09-cv-00878 PMP-GWF, Order, Docket

4   No. 39, filed September 1, 2009.

5          As stated in <u>Pittman</u>, service of notice by first class mail is arguably the preferred method

6   for class certification notice because it ensures the integrity of a judicially controlled

7   communication directed to the intended audience.  *Reab v. Electronic Arts, Inc.*, 214 F.R.D. 623,

8   630-31 (D.Colo. 2003).  *Reab* stated that serving notice by email raises various problems including

9   the possibility that the notice will be forwarded to other people via the internet with commentary

10  that could distort the notice or will be forwarded to non-class members and/or posted on the

11  internet.  As *Krzesniak v. Cendant Corp.*, 2007 WL 4468678, *2  (N.D.Cal. 2007) notes, however,

12  a printed notice can easily be electronically scanned and then transmitted through the internet or

13  posted to internet websites.  Thus, the concerns identified in *Reab* also exist in regard to printed

14  notices that are initially sent by regular mail.  Email is an efficient and inexpensive method for

15  providing notice where the intended recipients have reasonably accessible email addresses.  *Davis*

16  *v. Westgate Planet Hollywood Las Vegas*, 2009 WL 102735, at *13, *15, provides support for the

17  service of notice by email.  Although Defendant has requested that distribution of the notice be

18  limited to first class mail, it has not raised any issue regarding the feasibility of also delivering the

19  notice to employees *via* email.  The Court therefore authorizes the distribution of the notice to

20  potential class members by first class mail and *via* email.  Counsel for the parties are directed to

21  meet and confer on the feasibility of email distribution and may, if necessary, further submit this

22  matter to the Court if they cannot agree on details of this method of distribution.

23         The Court will not, however, require that the notice be posted in the workplace or

24  published in Defendant's newsletter.  Posting or publication are appropriate methods for providing

25  notice when individual methods of service are unsuccessful or likely to be inadequate.  Defendant

26  presumably has accurate mailing addresses for its former and current employees who are within

27  the class and who should therefore receive actual notice by first class mail or email.  There is also

28  no evidence that posting or publication of the notice will effectively notify former employees for

22

whom Defendant no longer has current addresses.  Posting the notice in the workplace or publishing it in Defendant's newsletter will, however, distribute the notice to persons who are not in the proposed class and is likely to cause confusion and unnecessarily give the impression that the as-yet unproven allegations against Defendant are true.  *See Owen v. West Travel, Inc.*, 2003 U.S. Dist. LEXIS 26212, *25 (W.D.Wash. 2003).

### (c)    Time Limit for Additional Plaintiffs to Join this Action.

Plaintiff requests that the Court allow additional plaintiffs to join this action for up to 120 days after notification is mailed to potential plaintiffs.  Defendant argues that a shorter period of 45 days is sufficient.  Although Ms. Allerton, Mr. Henderson and Mr. Sullivan all estimate that there were between 700 and 800 employees in Defendant's call center, it also appears from their declarations that the total number of hourly employees who were allegedly subject to Defendant's unlawful policy or practice was in the range of 250 employees at any given time.  Even accounting for an allegedly large turnover in such employees, the size of the class does not appear so substantial as to require an extended time for potential plaintiffs to opt-in.  The class is also limited to employees who worked or still work for Defendant in its Las Vegas call center.  While some of these individuals probably no longer reside in Nevada, this is not a case in which there is a need for a longer opt-in period because numerous potential class members reside outside Nevada.  Based on the foregoing information, the Court concludes that an opt-in period of 60 days is reasonable.

### III.    Tolling of the Statute of Limitations.

The statute of limitations for non-willful violations of the FLSA is two years.  Willful violations are subject to a three year statute of limitations.  29 U.S.C. §255.  The statute of limitations on each individual opt-in plaintiff's claim continues to run until his or her consent to joinder is filed with the Court.  Plaintiff requests that this Court toll the running of the statute of limitations for all opt-in plaintiffs for the period the instant motion is pending.

The Ninth Circuit recognizes that equitable tolling of the statute of limitations may be appropriate in two situations:  (1) where the plaintiffs are prevented from asserting their claims by some kind of wrongful conduct by the defendant or (2) extraordinary circumstances beyond

plaintiff's control made it impossible to file the claims on time. *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996). Plaintiff argues that the court should generally toll the running of the statute of limitations while a motion for circulation of notice is pending because, otherwise, defendants will be encouraged to always oppose such motions in order to delay the giving of notice and thereby cause claims to expire, in whole or in part. The judges in this district have generally rejected this argument. *See e.g. Davis v. Westgate Planet Hollywood Las Vegas*, 2009 WL 102735 at *14.

There may be circumstances in which a defendant's opposition to a motion for conditional class certification is so lacking in merit that it is reasonable to conclude that it has been filed in bad faith and for the wrongful purpose of delay. In such circumstances, equitable tolling under the first situation cited in *Alvarez-Machain* is appropriate. That is not the situation in this case. There is also no evidence of any extraordinary circumstances beyond the potential plaintiffs' control that make it impossible for them to file their claims on time. Accordingly, Plaintiff's request that the Court toll the statute of limitations during the pendency of the instant motion is denied.

## CONCLUSION

Based on the foregoing, the Court concludes, with some reservation, that Plaintiff has made an adequate showing for conditional certification of an FLSA class consisting of hourly non-salaried employees in Defendant's Las Vegas Nevada call center between June 12, 2006 and June 6, 2009 and whose duties included, in whole or in part, answering and handling incoming calls from Defendant's customers and who were allegedly not paid regular or overtime wages for work performed prior to the start of their shifts. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Circulation of Notice of the Pendency of this Action Pursuant to 29 U.S.C. § 216(b) and for Other Relief (#7) is **granted**, in part, and **denied**, in part, in accordance with the provisions of this order and as follows:

       1.     Notice of the pendency of this action shall be sent to all individuals who worked for Defendant as hourly, non-salaried employees in the Credit, Business Wireless Technical Support (BWTS) and Business Customer Service (BCS) departments of Defendant Sprint's Las Vegas Nevada call center between June 12, 2006 and June 6, 2009

and whose duties included, in whole or in part, answering and handling incoming calls from Defendant's customers.

2.      The parties shall use the forms of Notice of Pendency of Collective Action and Consent to Join attached to this Order.

3.      Defendants shall have until **December 16, 2009** in which to provide counsel for Plaintiff with the names, addresses, and telephone numbers of the proposed class members.

4.      Counsel for Plaintiff shall have ten (10) days from receipt of the names and addresses of the potential class members in which to circulate the notice by first class mail to the proposed class members at Plaintiff's counsel's expense.

5.      The Notice shall also be distributed to Defendant's employees by email in a manner to be agreed to by the parties or, if necessary as determined by the Court pursuant to further order.

6.      Potential class members shall have sixty (60) days from circulation of the notice of pendency in which to opt-in to this action.

DATED this 16th day of November, 2009.

_George Foley Jr._
_____
GEORGE FOLEY, JR.
United States Magistrate Judge

<u>NOTICE OF PENDENCY OF COLLECTIVE ACTION</u>
<u>LAWSUIT UNDER THE FAIR LABOR STANDARDS ACT</u>

TO:    All current and former hourly, non-salaried employees who worked in the Credit, Business Wireless Technical Support (BWTS) and Business Customer Service (BCS) departments of Defendant Sprint's Las Vegas Nevada call center between June 12, 2006 and June 6, 2009 and whose duties included, in whole or in part, answering and handling incoming calls from Defendant's customers.

Re:    Lawsuit entitled: Jodi Allerton, individually, and on behalf of others similarly situated, Plaintiffs, versus  SPRINT NEXTEL CORPORATION, Defendant, filed in the United States District Court for the District of Nevada, Case No. 2:09-cv-01325-RLH-GWF.

<u>INTRODUCTION</u>

The purpose of this notice is to:

1. inform you of the existence of a lawsuit in which you may be "similarly situated" to the named plaintiff;

2. advise you how your rights may be affected by this lawsuit; and

3. instruct you on the procedure for participating in this lawsuit, if you choose to do so.

**NOTE:  This Notice is <u>not</u> an expression of any opinion by the court as to the merits of any claims or defenses asserted by any party to this action as those issues have not been decided.**

<u>DESCRIPTION OF THE LAWSUIT</u>

Plaintiff Jodi Allerton alleges that Defendant Sprint Nextel Corporation ("Sprint") violated the Fair Labor Standards Act.  Specifically, Plaintiff claims that she and other similarly situated non-salaried employees who worked in Defendant Sprint's Las Vegas, Nevada call center are owed unpaid regular or overtime wages for time they spent logging into their computers and opening computer programs or applications prior to the beginning of their work shifts.  Plaintiff seeks the recovery of unpaid wages and liquidated damages (double damages) in an amount equal to the unpaid regular or overtime wages owed under the Fair Labor Standards Act.

Defendant Sprint disputes Plaintiff's claims and denies that it is liable to Plaintiff or other similarly situated employees for any unpaid wages.  Sprint states that all of its non-salaried employees in the Las Vegas, Nevada call center were paid for all regular time and overtime worked during the course of their employment and that employees are prohibited from working for Sprint without being paid.

<u>DESCRIPTION OF A COLLECTIVE ACTION</u>

A collective action is a lawsuit in which the claims of a group or class of people are decided in a single court proceeding.  In a collective action brought pursuant to the Fair Labor Standards Act, individuals who are within the class of persons on whose behalf the action is brought must consent to join in the action and have their individual claims decided in the action.

<u>COMPOSITION OF THE CLASS</u>

The Class of persons eligible to respond to this Notice and participate in this case are all current and former hourly, non-salaried employees who worked in the Credit, Business Wireless Technical Support (BWTS) and Business Customer Service (BCS) departments of Defendant Sprint's Las Vegas Nevada call center between June 12, 2006 and June 6, 2009 and whose duties included, in whole or in part, answering and handling incoming calls from Defendant's customers.

## ELIGIBILITY TO PARTICIPATE IN THIS LAWSUIT

If you are an individual within the above described Class, then you are eligible to participate in this action.  If you wish to participate in this action, then  you may join this lawsuit by mailing the enclosed "Consent To Join" form to Plaintiff's counsel at the following address:

> Leon Greenberg Esq.
> 633 S. 4th Street #4
> Las Vegas, NV 89101

If you wish to join this lawsuit, you must send the "Consent To Join" form to Leon Greenberg so that he has time to file it with the Federal Court on or before SIXTY (60) DAYS FROM THE DATE OF THE ISSUANCE OF THIS NOTICE which is _____.

If you do not return the "Consent To Join" form to Leon Greenberg in time for it to be filed with the Federal Court, you will not be able to participate in the Fair Labor Standards Act portion of this lawsuit.

## LEGAL EFFECT OF JOINING THIS LAWSUIT

If you choose to join this case, you will become a plaintiff in this lawsuit and you will bound by the decision of the court, whether it is favorable or unfavorable.

The attorneys for the plaintiffs in this lawsuit are being paid on a contingency fee basis, which means that if there is no recovery, the plaintiffs will not have to pay attorneys' fee to plaintiffs' attorneys.  If the plaintiffs prevail in this litigation, the attorneys for the plaintiffs will request that the federal court either determine or approve the amount of attorneys' fees and costs that they are entitled to receive for their services.

If you sign and return the "Consent to Join" form, you agree to designate the Plaintiff Jodi Allerton as your agent:

1.      to make decisions on your behalf concerning the method and manner of conducting this lawsuit;

2.      to enter into an agreement with plaintiffs' counsel concerning attorneys' fees and costs; and

3.      to decide all other matters pertaining to this lawsuit.

The decisions and agreements made and entered into by the representative plaintiff will be binding on you if you join this lawsuit. However, the court has the authority to determine the reasonableness of any attorneys' fees and costs that are to be paid to the plaintiffs' counsel if the plaintiffs succeed in this action.

## LEGAL EFFECT OF NOT JOINING THIS LAWSUIT

You do not have to join this lawsuit.  If you do not wish to participate in this lawsuit, then do nothing.  If you do not join this lawsuit, you will not be affected by any judgment or settlement rendered in this lawsuit, whether favorable or unfavorable to the Class.  If you do not wish to join in this lawsuit, your right to file your own lawsuit under the Fair Labor Standards Act will not be affected.

## STATUTE OF LIMITATIONS ON POTENTIAL CLAIMS

The maximum period of time that you may collect unpaid wages under the Fair Labor Standards Act is two (2) years from when you worked the time for which you were not paid either regular or overtime wages.   If the Defendant's failure to pay regular or overtime wages was willful, then the maximum period of time that you may collect unpaid wages under the Fair Labor Standards Act is three (3) years from when you worked the time for which you were not paid regular or overtime wages.   The statute of limitations continues to run until you file with the court a written consent to join this lawsuit or you file your own lawsuit to collect unpaid wages.

## NO RETALIATION PERMITTED

Federal law prohibits Sprint from discharging you or retaliating against you because you have exercised your rights under the Fair Labor Standards Act.

## YOUR IMMIGRATION STATUS DOES NOT MATTER IN THIS CASE

You are entitled to be paid minimum wages and where applicable, overtime wages under the Fair Labor Standards Act even if you are not otherwise legally entitled to work in the United States.  Your immigration status does not affect your right to participate in this case if you choose to do so.

## YOUR LEGAL REPRESENTATIVE IF YOU JOIN

If you choose to join this lawsuit and agree to be represented by the named plaintiff through her attorney, your counsel in this action will be:

Leon Greenberg, Esq.                              Christian Gabroy, Esq.
Mark Thierman, Esq.                               Gabroy Law Offices
633 South Fourth Street, #4   and            170 S. Green Valley Pkwy, #280
Las Vegas, NV 89101                             Henderson, NV 89012

## FURTHER INFORMATION

Further information about this Notice, the deadline for filing a "Consent to Join" form, and information about the lawsuit may be obtained by contacting:

Leon Greenberg, Esq.
633 South Fourth Street Suite #4
Las Vegas, NV 89101
(702) 383-6369
Email: leongreenberg@overtimelaw.com

The Federal Court has taken no position in this case regarding the merits of the plaintiff's claims or the defendant's defenses.

**DO NOT CONTACT THE CLERK OF THE COURT OR THE JUDGES' CHAMBERS REGARDING THIS NOTICE.**

**THE DATE OF ISSUANCE OF THIS NOTICE IS:   _____ .**

3

## CONSENT TO JOIN PURSUANT TO 29 U.S.C. §216(b)

Allerton vs. Sprint Nextel Corporation, Case No. 2:09-cv-01325-RLH-GWF.

TO:   THE CLERK OF COURT AND TO EACH PARTY AND COUNSEL OF RECORD

1.   I reside at: _____
      (Street and include any apartment number)

      _____
      (City)

      _____     _____
      (State)                  (Zip code)

2.   My home telephone number is _____ (leave blank if you do not have a telephone)

3.   My current email address (if any) is _____

4.   I understand that a lawsuit has been brought under the Federal Fair Labor Standards Act. I have read and I understand the notice accompanying this consent.

5.   I understand and agree that I designate the named plaintiffs as my agent and understand that I will be bound by the decisions and agreements made by and entered into by said plaintiffs.

6.   I understand that I will be represented by Mark Thierman, Esq., and Leon Greenberg, Esq. and that this Court has retained jurisdiction to determine the reasonableness of any settlement with the defendants and any agreement concerning the reasonableness of any attorneys' fees and costs that are to be paid to the plaintiffs' counsel.

      _____
      (Signature)

      _____
      (Type or Print Name)

READ, FILL OUT, SIGN AND RETURN TO:    Leon Greenberg, Esq.
                                  633 S. Fourth Street, #4
                                  Las Vegas, NV  89101